**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| MICHELLE L. VIEIRA, *as Ch. 7 bankruptcy trustee for debtors Ken C. Goss and Gretchen G. Goss*, | ) ) ) | |
| | ) | No. 2:13-cv-2610-DCN |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| | ) | **ORDER** |
| MARK SIMPSON, CHRISTY A. SIMPSON, SIMPSON FAMILY HOLDINGS INC., AARON L. SILVERMAN, and JONES SIMPSON & NEWTON PA, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

This matter is before the court on a motion for summary judgment filed by defendant Aaron Silverman ("Silverman"); a motion for summary judgment filed by defendants Christy Simpson ("Christy") and Simpson Family Holdings, Inc. ("SFH") (collectively, "SFH defendants"); and a motion for summary judgment filed by Mark Simpson ("Mark") and Jones, Simpson & Newton, P.A. ("JS&N") (collectively, "JS&N defendants"). For the reasons set forth below, the court grants all three motions.

## I.  BACKGROUND[1]

This case arises out of a loan transaction between debtors Ken and Gretchen Goss ("Ken" and "Gretchen," or "the Gosses") and SFH, a South Carolina corporation owned by Christy. In June 2007, Ken, a residential home builder, contacted Mark, his attorney who had performed a number of real estate closings for Ken in the past, to ask Mark

---

[1] The facts are considered and discussed in the light most favorable to Vieira, the party opposing all three motions for summary judgment. See Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

whether he knew of any investors willing to make a loan to the Gosses so that they could finish one of their home remodeling projects on Hilton Head Island, South Carolina. Sometime later, Mark contacted Ken to inform him that he had found an investor willing to make the loan. Mark instructed the Gosses to meet with him and the lender at the law offices of JS&N, a law firm at which Mark was, and still is, a partner. Once they arrived at JS&N, the Gosses learned that the prospective lender was SFH, a corporation owned by Mark's wife, Christy.[2] Mark was SFH's vice president. Mark did not advise the Gosses to seek independent legal counsel and did not at that time disclose the fact that he was the vice president of SFH.

The terms of the loan were set out in a note which the Gosses signed on June 29, 2007. JS&N Defs.' Mot. Ex. A. The essential terms included $200,000 principal, a 15% interest rate, and a $15,000 premium to be paid by the borrower at the time the loan was paid off. Id. The maturity date of the loan was June 28, 2008. Id. The loan was secured by a second mortgage on a home owned by the Gosses. Id. As a result of various adjustments, the Gosses received $122,623.20 at the closing. JS&N Defs.' Mot. Ex. E. The Gosses consented to JS&N representing both parties to the transaction. JS&N Defs.' Mot. Ex. I.

The note was modified either four or five times between the time it was signed and August 25, 2009.[3] JS&N Defs.' Mot. Exs. L, M, and N; Pl.'s Resp. to JS&N Defs.'

---

[2] Mark claims that Christy inherited SFH from her father and that he had no ownership interest in the company. Mark Simpson Dep. 17:24-20:17.

[3] Three of the modifications, the first two and the last one, are not in dispute. However, only the JS&N defendants attach a modification setting April 30, 2009 as the maturity date, JS&N Defs.' Mot. Ex. N, and only Vieira attaches a modification setting July 31, 2009 as the maturity date. Pl.'s Resp. to JS&N Defs.' Mot. Ex. I at 5. Notably, the final modification references the modification changing the maturity date to July 31,

Mot. Ex. I at 5.  Each modification extended the maturity date of the loan and adjusted

the premium due when the loan was paid off.  Id.  Mark signed the modifications as vice

president of SFH.  Id.  On August 3, 2009, SFH sued the Gosses in the South Carolina

Court of Common Pleas for nonpayment of the note.  JS&N Defs.' Mot. Ex. O.  The case

settled, resulting in the final modification of the note, which extended the maturity date to

August 30, 2009.  JS&N Defs.' Mot. 4.

On August 25, 2009, the Gosses signed a document titled "Collateral Assignment

of Limited Partnership Interest," which assigned to SFH the Gosses' right to receive

payment from their interest in the Goss Family Limited Partnership ("the partnership").

JS&N Defs.' Mot. Ex. Q.  At some point prior to this assignment, Mark approached

Silverman to determine whether he was interested in investing in the note.  Silverman

Dep. 26:2-20.  Following the initial assignment of the limited partnership interest, SFH

assigned a one-third interest in the note, mortgage, and collateral interest in the limited

partnership to Silverman.  JS&N Defs.' Mot. Ex. R.  On January 13, 2010, SFH assigned

Silverman an additional one-sixth of its interest in the note, mortgage, and collateral

interest in the limited partnership.  Pl.'s Resp. to JS&N Defs.' Mot. Ex. E at 10.  A

variety of assignments followed:  on January 26, 2010, Silverman assigned one-sixth of

his interest in the note, mortgage, and collateral interest in the limited partnership to

PENSCO Trust Company for the benefit of Mark's IRA; on November 30, 2010, SFH

assigned one-third of its interest in the note, mortgage, and collateral interest in the

limited partnership to Mark and Christy; on December 3, 2010, SFH assigned one-sixth

---

2009, but does not reference the modification changing the maturity date to April 30,
2009.  JS&N Defs.' Mot. Ex. P.  Regardless, the exact number of modifications is not
essential to the court's analysis of the three motions.

of its interest in the note, mortgage, and collateral interest in the limited partnership to Silverman; and on December 9, 2010, Silverman assigned one-sixth of his interest in the note, mortgage, and collateral interest in the limited partnership to PENSCO for the benefit of Christy's IRA.  Id.  According to Vieira, after these assignments, the parties held the following interests in the note, mortgage, and collateral interest in the limited partnership:  Silverman held 36.01%, SFH held 30.86%, Mark and Christy held 18.52%, PENSCO A held 7.41%, and PENSCO B held 7.20%.[4]  Pl.'s Resp. to JS&N Defs.' Mot. 3.

On October 8, 2009, Paul Clark ("Clark") filed suit against Ken to collect on a separate $150,000 loan he made to Ken.  JS&N Defs.' Mot. Ex. S.  In connection with that litigation, Ken signed a conflict of interest waiver.  Pl.'s Resp. to JS&N Defs.' Mot. Ex. H.  The Gosses waived any claim of conflict of interest against JS&N or Mark that may arise as a result of their representation of the Gosses in the litigation with Clark.  Id.

On January 25, 2012, the Gosses filed for Chapter 7 bankruptcy.  On April 22, 2013, plaintiff Michelle Vieira ("Vieira"), as bankruptcy trustee, filed this action in the bankruptcy court alleging the following causes of action:  fraud, negligence, and breach of fiduciary duty against Mark; malpractice against Mark and JS&N; breach of fiduciary duty against JS&N; violation of the Fair Debt Collection Practices Act ("FDCPA") against SFH, Mark, and Christy; and civil conspiracy/joint enterprise, disgorgement of ill-gotten gain, and equitable subordination against all defendants.  One September 6, 2013, Mark and JS&N moved for an order withdrawing reference of this proceeding from the bankruptcy court.  The matter was transferred to this court on September 25, 2013.

---

[4] The accuracy of these percentages is not essential to the court's analysis.

On July 23, 2014, Silverman moved for summary judgment. The next day, the JS&N defendants and the SFH defendants moved for summary judgment. Vieira responded to all three motions on September 9, 2014. Silverman filed a reply on September 19, 2014. The court had the benefit of oral argument at a hearing held on October 30, 2014. All three motions are ripe for the court's review.

## II.  STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

## III.  DISCUSSION

The court will consider each of the motions for summary judgment in turn.

### A.    JS&N Defendants' Motion for Summary Judgment

The JS&N defendants argue that they are entitled to summary judgment on all of Vieira's claims.  The court will consider each cause of action in turn, albeit in a slightly different order than either Vieira's complaint or the JS&N defendants' motion.

### 1.    Counts III, IV & V – Negligence and Breach of Fiduciary Duty

The JS&N defendants argue that they are entitled to summary judgment on Vieira's negligence and breach of fiduciary duty claims because those claims are duplicative of her legal malpractice claim.

The South Carolina Supreme Court has held that a breach of fiduciary duty claim is "duplicative" of a legal malpractice claim where the claim for breach of fiduciary duty "arose out of the duty inherent in the attorney-client relationship and it arose out of the same factual allegations."  RFT Mgmt. Co. v. Tinsley & Adams L.L.P., 732 S.E.2d 166, 173 (S.C. 2012).  While the South Carolina Supreme Court has not explicitly applied the same analysis to negligence claims, other courts have dismissed negligence claims as duplicative.  See Meador v. Albanese Law Office, 2010 WL 3807163, at *4 (N.D.N.Y. Sept. 23, 2010) ("Where claims of negligence, breach of contract, breach of fiduciary duty, negligent misrepresentation, or fraudulent misrepresentation are premised on the same facts and seek identical relief as a claim for legal malpractice, those claims are duplicative and must be dismissed."); see also Aller v. Law Office of Carole C. Schriefer, P.C., 140 P.3d 23, 26 (Colo. App. 2005) (holding that a legal malpractice action is "essentially based on negligence").

Vieira's breach of fiduciary duty and negligence claims are based entirely on the attorney-client relationship between Mark and the Gosses.  See Compl. ¶¶ 82 ("An

6

attorney-client relationship existed between Defendant Mark Simpson and Ken and Gretchen Goss which created a duty on Defendant Simpson to represent the Gosses with loyalty, to preserve the Gosses (sic) confidences, and to disclose all material matters relating to the representation."), 87 ("A fiduciary relationship existed between Defendant Mark Simpson and the Gosses as the attorney-client relationship is by its nature a fiduciary one."). As in <u>RFT Mgmt.</u>, Vieira has not pled facts demonstrating that her negligence or breach of fiduciary duty claims "arise[] out of a duty <u>other than</u> one created by the attorney-client relationship." <u>RFT Mgmt.</u>, 732 S.E.2d at 173 (emphasis in original).

Therefore, the court grants the JS&N defendants summary judgment as to Vieira's negligence and breach of fiduciary duty claims.[5]

### 2.    Count VI – Violation of the FDCPA

Mark argues that he is entitled to summary judgment on Vieira's claim for violation of the FDCPA because he is not a debt collector under the act.[6]

The FDCPA provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The FDCPA defines "debt collector" as:

> [A]ny person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or

---

[5] The complaint asserts slightly different breaches under the three causes of action, although they all relate to the same facts and the same general duty. To the extent the exact breaches pled under negligence and breach of fiduciary duty are not present under the malpractice claim, including failure to abide by the South Carolina Rules of Professional Conduct, the court will nonetheless allow Vieira to assert these breaches under the malpractice claim.

[6] JS&N is not a named defendant in the FDCPA cause of action.

indirectly, debts owed or due or asserted to be owed or due another. . . . <u>The term does not include</u>–

(A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor;

. . .

(D) any person while serving or attempting to serve legal process on any other person in connection with the judicial enforcement of any debt;

15 U.S.C. § 1692a(6) (emphasis added).

Mark first argues that he is not a debt collector under the act. As an initial matter, there is no evidence that Mark is involved in a "business the principal purpose of which is the collection of any debts" or that he "regularly collects or attempts to collect . . . debts owed or due or asserted to be owed or due to another." Vieira has not identified any other debt that Mark has ever attempted to collect besides the Gosses' debt. Moreover, Mark, as vice president of SFH, falls squarely within § 1962a(6)(A), which excludes from the definition of debt collector an "officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor." Notably, Mark sent each collection letter on SFH letterhead. <u>See</u> Pl.'s Resp. to JS&N Defs.' Mot. Ex. J.

Because Mark is not a debt collector, the court grants him summary judgment as to Vieira's FDCPA claim.

### 3.    Count VII – Civil Conspiracy

The JS&N defendants argue that they are entitled to summary judgment on Vieira's civil conspiracy/joint enterprise claim.

In order to prove civil conspiracy, a plaintiff must show (1) the combination of two or more people, (2) for the purpose of injuring the plaintiff, (3) which causes the plaintiff special damage. <u>Pye v. Estate of Fox</u>, 633 S.E.2d 505, 511 (S.C. 2006).

"The 'essential consideration' in civil conspiracy 'is not whether lawful or unlawful acts or means are employed to further the conspiracy, but whether the primary purpose or object of the combination is to injure the plaintiff.'" Id. (quoting Lee v. Chesterfield Gen. Hosp., Inc., 344 S.E.2d 379, 383 (S.C. Ct. App. 1986)). "[I]n order to establish a conspiracy, evidence, direct or circumstantial, must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise." Id. (citation omitted).

The JS&N defendants argue that there is no evidence that they acted in concert with anyone else in an effort to injure the Gosses or their business. JS&N Defs.' Mot. 28. They argue that the only cognizable evidence in the record indicates that they acted out of a desire to help the Gosses and in hopes of making a profit. Id. In her response, Vieira quotes extensively from Silverman's deposition. Pl.'s Resp to JS&N Defs.' Mot. 22-24. However, nowhere in that testimony does Silverman indicate a purpose of injuring the Gosses. Instead, Silverman testified that Mark approached him to see if he was interested in buying a portion of the note, Silverman indicated that he would only do so if there was other collateral, and Mark discussed that the Gosses had an interest in the partnership which had not yet been taken as collateral. See Pl.'s Resp. to JS&N Defs.' Mot. 22-24.

A civil conspiracy will not lie if a plaintiff fails to establish that the purpose of the defendants was "anything other than profit motivated, and not meant to deprive [the plaintiff] of her property." Bivens v. Watkins, 437 S.E.2d 132, 136 (S.C. Ct. App. 1993). The evidence presented by Vieira indicates at most a desire by Silverman and the JS&N defendants to earn a profit. There is absolutely no indication that their purpose was to injure the Gosses. Therefore, Vieira's claim for civil conspiracy fails as a matter of law.

To the extent Vieira attempts to recover under a joint enterprise theory, this claim also fails.  "A joint enterprise exists where there are two or more persons united in the joint prosecution of a common purpose under such circumstances that each has authority, express or implied, to act for all in respect to the control of the means and the agencies employed to execute such common purpose."  <u>Peoples Fed. Sav. & Loan Ass'n v. Myrtle Beach Golf & Yacht Club</u>, 425 S.E.2d 764, 774 (S.C. Ct. App. 1992) (citation omitted). "[I]n order to constitute a joint enterprise, there must be a common purpose and community of interest in the object of the enterprise and an equal right to direct and control the conduct of each other with respect thereto."  <u>Id.</u> (citation omitted).  Here, Vieira has provided no evidence that defendants were acting for any common purpose or that they had an equal right to direct or control each other's conduct.

The court grants the JS&N defendants' summary judgment as to Vieira's civil conspiracy/joint enterprise claim.

### 4.     Count II – Legal Malpractice

The JS&N defendants argue that they are entitled to summary judgment on Vieira's legal malpractice claim for three reasons:  (1) it is barred by the statute of limitations, (2) the JS&N defendants did not breach any duty owed to the Gosses, and (3) the Gosses did not suffer any damages proximately caused by the JS&N defendants.

### a.     Statute of Limitations

Under South Carolina law, claims for legal malpractice are subject to a three-year statute of limitations.  S.C. Code § 15-3-530(5); <u>Kelly v. Logan, Jolley, & Smith, LLP</u>, 682 S.E.2d 1, 4 (S.C. Ct. App. 2009).  "Under the discovery rule, the statute of limitations begins to run from the date the injured party either knows or should know, by

the exercise of reasonable diligence, that a cause of action exists for the wrongful conduct." Epstein v. Brown, 610 S.E.2d 816, 818 (S.C. 2005) (citations omitted); S.C. Code Ann. § 15-3-535. "The exercise of reasonable diligence means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." Id. (emphasis in original). "The statute of limitations begins to run from this point and not when advice of counsel is sought or a full-blown theory of recovery developed." Id. (emphasis in original).

The Gosses' bankruptcy petition impacts the statute of limitations analysis. Under 11 U.S.C. § 108, if a statute of limitations has not expired before the date the bankruptcy petition was filed, the trustee may commence such action by the later of the end of the limitations period or two years after the order for relief. The parties agree that the order for relief was signed on January 25, 2012. See JS&N Defs.' Mot. 7; Pl.'s Resp. to JS&N Defs.' Mot. 7. Therefore, Vieira's malpractice claim will be barred to the extent it was discovered prior to January 25, 2009.

### i.     Equitable Tolling

Before delving into an analysis of when the statute of limitations accrued and when it expired, the court must consider Vieira's assertion that equitable tolling prevents the JS&N defendants from claiming the statute of limitations as a defense entirely. Pl.'s Resp. to JS&N Defs.' Mot. 7.

"[I]n order to serve the ends of justice where technical forfeitures would unjustifiably prevent a trial on the merits, the doctrine of equitable tolling may be applied

to toll the running of the statute of limitations." <u>Hooper v. Ebenezer Sr. Servs. & Rehab.</u> <u>Ctr.</u>, 687 S.E.2d 29, 32 (S.C. 2009) (citing 54 C.J.S. <u>Limitations of Actions</u> § 115 (2005)). "Where a statute sets a limitation period for action, courts have invoked the equitable tolling doctrine to suspend or extend the statutory period to ensure fundamental practicality and fairness." <u>Id.</u> (citation and internal quotation marks omitted). The party claiming the statute of limitations should be tolled bears the burden of establishing sufficient facts to justify its use. <u>Id.</u>

In <u>Hooper</u>, the South Carolina Supreme Court noted that equitable tolling "typically applies in cases where a litigant was prevented from filing suit because of an extraordinary event beyond his or her control." <u>Id.</u> While the court declined to provide an "exclusive list of circumstances that justify the application of equitable tolling" and noted that "[e]quitable tolling may be applied where it is justified under all the circumstances," it cautioned that it "should be used sparingly and only when the interests of justice compel its use." <u>Id.</u> at 33.

Vieira contends that the court should apply equitable tolling because Mark withheld information relating to the transactions at issue and acted adverse to the Gosses' interest. Pl.'s Resp. to JS&N Defs.' Mot. 8. She argues that such conduct "would lead a reasonable person to conclude that perhaps a lawsuit was unnecessary." <u>Id.</u> However, this argument belies the fact that when Ken signed the initial loan transaction on June 29, 2007, he thought it was "very odd" and felt that he "couldn't be advised properly" because there was a "huge conflict" of interest. Ken Dep. 43:23-44:7. Additionally, Ken "protest[ed]" signing the modifications to the loan. <u>Id.</u> at 61:3-9. While the court is mindful that "[t]he relationship between an attorney and a client is highly fiduciary in its

nature and of a very delicate, exacting and confidential character," <u>Ellis v. Davidson</u>, 595 S.E.2d 817, 823 (S.C. Ct. App. 2004), Mark's position as the Gosses' lawyer was not an extraordinary event that kept the Gosses in the dark or prevented them from recognizing any alleged impropriety in the loan transaction. This is not a situation, as Vieira describes it, in which Mark "induce[d] the plaintiff into a false belief that his lawyer [was] acting on his behalf." Pl.'s Resp. to JS&N Defs.' Mot. 8. Rather, the Gosses knew from the beginning that a "huge" conflict existed and that Mark could not advise them properly. The fact that the Gosses, embroiled in a transaction they were suspicious of from the start, thought that <u>perhaps</u> a lawsuit was unnecessary due to their attorney's representations is insufficient to meet their burden to equitably toll the statute of limitations.

After considering the facts of this case, and mindful of the South Carolina Supreme Court's instruction that equitable tolling should only be used "sparingly," the court declines to apply equitable tolling to suspend or extend the three-year statute of limitations. Vieira has not shown extraordinary events beyond the Gosses' control or any other circumstances that prevented them from filing suit or to warrant equitable tolling.

### ii.    Accrual

The parties disagree regarding when the Gosses knew or should have known that a cause of action for malpractice existed and therefore when the statute of limitation began to run. The JS&N defendants argue that all of Vieira's claims arise out of SFH's loan, and that therefore the statutes of limitations began to run when the loan closed on June 29, 2007. JS&N Defs.' Mot. 6. The JS&N defendants also argue that the various modifications of the loan do not change the statute of limitations analysis because the

modifications are not new transactions but rather an adjustment to an existing loan and because any knowledge the Gosses had with respect to the original loan applies equally to the subsequent modifications.  JS&N Defs.' Mot. 7.  On the other hand, Vieira argues that the statute of limitations did not begin running until the collateral assignment of the partnership on August 25, 2009.  Pl.'s Resp. to JS&N Defs.' Mot. 6.  Vieira argues that "[t]he damages are largely related to the loss of that interest, and the claims brought in this case against [Mark] and his law firm arise primarily out of the use of Goss's confidential financial information to his detriment while representing him on multiple fronts at the time Simpson acquired the interest in the oil and gas partnership." Id. at 7.

As discussed above, Ken believed that a conflict of interest existed at closing. Ken Dep. 43:17-44:7 (testifying that he thought it was "a huge conflict" to borrow money from the Simpson family because Mark "had an advantage because he was . . . [Ken's] lawyer" and that he "couldn't be advised properly").  When the loan was modified, Ken "protest[ed]" the "extreme amount of interest." Id. at 61:3-9.  The evidence shows that at the time the loan was signed, the Gosses were on notice that some right had been invaded or that some claim against Mark might exist.  Therefore, any claim for malpractice relating to actions taken by Mark before January 25, 2009—including the initial loan transactions as well as modifications and assignments—are barred by the statute of limitations.[7]

---

[7] In her response, Vieira asserts that Mark's conduct constituted a "continuing wrong," and therefore the statute of limitations for all of Mark's conduct did not begin to run until December 9, 2010, when he stopped assigning portions of the promissory note and interest in the partnership.  Pl.'s Resp. to JS&N Defs.' Mot. 7.  However, Vieira cites no case law delineating any such "continuing wrong" theory.  Additionally, the court has also come up empty in its search for any South Carolina cases applying a continuing

However, the court rejects the JS&N defendants' argument that Mark's actions after January 25, 2009 are barred by the statute of limitations simply because the loan was signed before January 25, 2009.  While the JS&N defendants correctly note that "[a] loan modification is an adjustment to an existing loan to accommodate borrowers who have defaulted," Crawford v. Cent. Mortgage Co., 744 S.E.2d 538, 542 (S.C. 2013), that does not mean that an attorney cannot breach duties to a client in the preparation or execution of such a modification.[8]  Therefore, the statute of limitations does not bar Vieira's malpractice claim as it relates to the JS&N defendants' actions after January 25, 2009.

### b.     Merits

"In order to prevail in a cause of action for legal malpractice, the plaintiff must prove:  (1) the existence of an attorney-client relationship; (2) a breach of duty by the attorney; (3) damage to the client; and (4) proximate cause of the client's damages by the breach."  Harris Teeter, Inc. v. Moore & Van Allen, PLLC, 701 S.E.2d 742, 745 (S.C. 2010) (citing Rydde v. Morris, 675 S.E.2d 431, 433 (S.C. 2009)).  "In South Carolina, attorneys are required to render services with the degree of skill, care, knowledge, and judgment usually possessed and exercised by members of the profession . . . ."  Id. (citation omitted).  While "in appropriate cases, the [Rules of Professional Conduct] may be relevant and admissible in assessing the legal duty of an attorney in a malpractice action," the failure to comply with the Rules is not negligence per se, but rather "a

---

wrong theory to a tort claim.  Therefore, no such theory works to bring Mark's actions prior to January 25, 2009 within the relevant limitations period.

[8] Similarly, while Crawford held that preparing loan modifications does not constitute the practice of law such that one must be an attorney to do so, 744 S.E.2d at 542, that does not mean that an attorney preparing a modification cannot breach a duty to his or her client.

15

circumstance that, along with other facts and circumstances, may be considered in determining whether the attorney acted with reasonable care in fulfilling his legal duties to a client." Smith v. Haynsworth, Marion, McKay & Geurard, 472 S.E.2d 612, 614 & n.6 (S.C. 1996). "In order to relate to the standard of care in a particular case, we hold that a Bar Rule must be intended to protect a person in the plaintiff's position or be addressed to the particular harm." Id. (citing Allen v. Lefkoff, Duncan, Grimes & Dermer, 453 S.E.2d 719, 721–722 (Ga. 1995)).

A plaintiff in a legal malpractice action must generally establish the standard of care by expert testimony. Id. at 613. Expert testimony concerning the standard of care is not required, however, in professional malpractice cases where the negligence is so obvious as to be "within the ambit of common knowledge and experience, so that no special learning is needed to evaluate the conduct of the defendant." Pederson v. Gould, 341 S.E.2d 633, 634 (S.C. 1986) (medical malpractice); Mali v. Odom, 367 S.E.2d 166, 168 (S.C. Ct. App. 1988) (applying common knowledge exception to legal malpractice claim).

The JS&N defendants argue that they are entitled to summary judgment because they did not breach any duty to the Gosses and, even if they did, the Gosses did not suffer any damage proximately caused by such a breach. JS&N Defs.' Mot. 10, 21. For the purposes of this section, the court will assume, without deciding, that Mark and the Gosses had an attorney-client relationship at all relevant times.

### i.    Breach

The JS&N defendants first argue that they did not breach any duty owed to the Gosses. JS&N Defs.' Mot. 10. Their argument largely tracks various Rules of

Professional Conduct.  Because Vieira does not discuss those Rules in her response, the court does not consider them here.

Rather, Vieira's response relies on the testimony of her expert John Freeman ("Freeman"), a professor at the University of South Carolina School of Law.  Pl.'s Resp. to JS&N Defs.' Mot. 10-11.   Freeman argues that Mark breached his "obligation to accurately convey material information to the plaintiff."  Freeman Dep. 35:15-17; see Anthony v. Padmar, Inc., 465 S.E.2d 745, 752 (S.C. Ct. App. 1995) ("Parties in a fiduciary relationship must fully disclose to each other all known information that is significant and material, and when this duty to disclose is triggered, silence may constitute fraud.").

Freeman discusses a number of breaches of this duty—such as failure to disclose who the lender was, the right to independent counsel, and that a conflict existed—which occurred around the time the loan transaction was finalized.  Id. 35:21-36:2.  However, as discussed above, these alleged breaches are barred by the statute of limitations.  The only failure to convey material information that Freeman identifies after January 25, 2009 is that Mark failed to disclose the assignment to Silverman.  Id. 36:2-3.  Freeman opines that there is a duty to disclose when an assignment of collateral is made to someone else in case the Gosses "want[ed] to redeem that interest," which they could not do if they "[did not] know who owns it."  Id. 36:7-10.  Freeman continues:  "if I had a big chunk of my property that I thought was in pocket 'A,' but part of it went to 'B' – a person 'B,' and I might, with family members, for example, want to redeem that property, I'd want to know about that transaction."  Id. 36:19-23.

Based on Freeman's expert testimony, there is a genuine issue of material fact as to whether Mark breached a duty to the Gosses by failing to inform them of the assignment to Silverman.

### ii.     Damage

The JS&N defendants argue that even if they did breach a duty to the Gosses, the Gosses did not suffer any damage proximately caused by the JS&N defendants' conduct. JS&N Defs.' Mot. 21.

Vieira's response consists entirely of a block quote from the deposition of her expert, John Freeman:

> Q:  All right.  What damages have the Gossess suffered that was (sic) proximately caused by Mark Simpson or his law firm.
>
> A:  I think they lost the capability of finding a way out of his misery, financial misery, at the time that he was induced to enter into this loan transaction with Mr. Simpson I think he – Crystal, [JS&N defendants' expert,] three times, uses some form of the word desperate, and I don't criticize him for that.  I think that Simpson – or I think that Goss and his wife were in desperate financial straits, and they really needed financial counseling.  They needed bankruptcy advice.  They needed somebody who was going to operate with an eye single to their best interest.
>
> And we'll never know if that would have provided a mechanism for some kind of workout arrangement, but he was deprived and cut out of that opportunity.  Instead, he had a piece of property in the form of this assignment that was seized and taken away from him by his lawyer, and I consider that to be improper.  My understanding is that piece of property was pumping out cash payments and did from the time that Mr. Simpson first got ahold of it for Simpson Family Holdings, and that on top of those payments in the many thousands of dollars, the property was sold in the bankruptcy for $300,000.
>
> So if you have a very available asset that had never been pledged before being taken away from Mr. Goss, growing out of his efforts to borrow $150,000 and losing that asset and being exposed to this process and being required to pay money in the form of fees, which we know he paid at least at the time of the closing of the loan transaction to a lawyer who was not looking after his best interest, I consider to be damages.

Freeman Dep. 7:10-8:16.

18

What Freeman does not describe, and Vieira does not articulate, is how Mark's failure to inform the Gosses that he assigned part of SFH's interest to Silverman—the only breach cognizable in this case—caused any damage to the Gosses. There is no evidence that the Gosses ever attempted to redeem their interest in the partnership. Therefore, without any allegation as to how Mark's failure to inform the Gosses of his assignment damaged them, the JS&N defendants are entitled to summary judgment on Vieira's malpractice claim.

### 5.      Fraud

The JS&N defendants argue that Mark is entitled to summary judgment on Vieira's fraud claim.[9]

### a.      Statute of Limitations

Under South Carolina law, claims for fraud are subject to the same three-year statute of limitations as claims for malpractice. S.C. Code § 15-3-530; Moore v. Benson, 700 S.E.2d 273, 277 (S.C. Ct. App. 2010). "[T]he statute of limitations for causes of action for fraud is governed by the discovery rule, and does not begin to run until discovery of the fraud itself or of such facts as would have led to the knowledge thereof, if pursued with reasonable diligence." Burgess v. Am. Cancer Soc., S. Carolina Div., Inc., 386 S.E.2d 798, 799 (S.C. Ct. App. 1989) (citation and internal quotation marks omitted). South Carolina courts have noted that the discovery rule applicable to fraud claims is "similar, if not identical," to the discovery rule applicable to legal malpractice claims. Id. at 800.

---

[9] JS&N is not a named defendant in the fraud claim.

Therefore, as laid out in greater detail above, Vieira's fraud claim will be barred to the extent it was discovered prior to January 25, 2009.  Vieira's fraud claim relates to both Mark's affirmative representation that there would be no conflict of interest as well as his failure to inform the Gosses of his duties under the South Carolina Rules of Professional Conduct or that they should seek independent counsel.  See Compl. ¶¶ 65-73; Pl.'s Resp. to JS&N Defs.' Mot. 13-17.  For the same reasons laid out above, the evidence shows that at the time the Gosses signed the note, they were on notice that a claim against Mark for fraud might exist.  Therefore, Vieira's fraud claim is barred by the statute of limitations to the extent the representations and omissions occurred before January 25, 2009.  To the extent that Mark failed to disclose material facts after January 25, 2009, the statute of limitations does not bar Vieira's claim.[10]

### b.    Merits

To establish fraud, the following nine elements must be shown:  (1) a representation or nondisclosure of a material fact, (2) its falsity, (3) its materiality, (4) either knowledge of its falsity or a reckless disregard of its truth or falsity, (5) intent that the representation be acted upon, (6) the hearer's ignorance of its falsity, (7) the hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury.  Kiriakides v. Atlas Food Sys. & Servs., Inc., 527 S.E.2d 371, 378 (S.C. Ct. App. 2000) (citations omitted).  Under South Carolina law, "[n]ondisclosure becomes fraudulent only when it is the duty of the party having knowledge of the facts to uncover them to the other."  Doe 2 v. Associated Press, 331 F.3d 417, 420 (4th Cir. 2003) (citing Warr v. Carolina Power & Light Co., 115 S.E.2d 799, 802 (S.C. 1960)).  Such a

---

[10] The court cannot find, either in the complaint or the parties' motions, any allegations of fraudulent misrepresentations made by Mark after January 25, 2009.

duty to disclose can arise in only three cases:  (1) where there exists a preexisting definite fiduciary relation between the parties; (2) where one party either expressly or (by virtue of the specific circumstances of the case) implicitly reposes a trust and confidence in the other with reference to the particular transaction in question; or (3) where the very contract or transaction itself, in its essential nature, is intrinsically fiduciary and necessarily calls for perfect good faith and full disclosure.  Id. (citing Jacobson v. Yaschik, 155 S.E.2d 601, 605 (S.C. 1967)).

Vieira bases her fraud claim on the JS&N defendants' failure to inform the Gosses of the desirability of seeking independent counsel in violation of South Carolina Rule of Professional Conduct.  Rule 1.8, in relevant part, provides:

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
>> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
>>
>> (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
>>
>> (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

The JS&N defendants argue that Rule 1.8(a) does not apply because Mark did not enter into a business transaction with the Gosses nor did he acquire any ownership, possessory, security or other pecuniary interest adverse to them.  JS&N Defs.' Mot. 11. They rely on the fact that the loan was between SFH and the Gosses and that SFH was entirely owned by Christy.  The JS&N defendants' expert, Professor Nathan Crystal,

opines that this is important because other parts of Rule 1.8 explicitly apply to family members of a lawyer.  See Rule 1.8(c) ("A lawyer shall not solicit any substantial gift from a client, including a testamentary gift, or prepare on behalf of a client an instrument giving the lawyer or a person related to the lawyer any substantial gift unless the lawyer or other recipient of the gift is related to the client."); Rule 1.8(k) ("A lawyer related to another lawyer as parent, child, sibling or spouse shall not personally represent a client in a representation directly adverse to a person whom the lawyer knows is represented by the other lawyer unless the client gives informed consent.").  When considering the equivalent North Dakota Rule of Professional Conduct, the North Dakota Supreme Court determined that an attorney did not violate Rule 1.8(a) where he prepared a quitclaim deed for a client transferring property to the attorney's wife.  In re Disciplinary Action Against Overboe, 844 N.W.2d 851, 860 (N.D. 2014).  The court determined that under the plain language of the rule, the "transactions were not between [the attorney] and [the client]."  Id.

The court agrees with the JS&N defendants that Rule 1.8 is not applicable here. What remains is a fiduciary's duty to disclose all significant and material information, as discussed above.  See Anthony, 465 S.E.2d at 752 ("Parties in a fiduciary relationship must fully disclose to each other all known information that is significant and material, and when this duty to disclose is triggered, silence may constitute fraud.").  However, Vieira again fails to indicate any injury suffered by the Gosses as a result of the JS&N defendants' failure to disclose the assignment to Silverman.  Therefore, the court grants the JS&N defendants summary judgment on Vieira's fraud claim.

### 6. Disgorgement

Because disgorgement is an equitable remedy, and the court grants the JS&N defendants summary judgment on Vieira's other claims, the court denies Vieira's request for disgorgement.

### 7. Equitable Subordination

The JS&N defendants assert that their claims should not be subordinated in the bankruptcy proceedings.

Under 11 U.S.C. § 510(c)(1), a court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." "Generally, equitable subordination involves a number of inquiries: (1) whether the claimant engaged in fraudulent conduct, (2) whether the conduct resulted in injury to creditors, and (3) whether subordination would be consistent with other bankruptcy law." In re ASI Reactivation, Inc., 934 F.2d 1315, 1321 (4th Cir. 1991). The inequitable conduct of the claimant under § 510(c) generally involves conduct such as fraud, breach of fiduciary duty, illegality, under-capitalization, or use of the debtor as an alter ego. In re Hoffman Associates, Inc., 194 B.R. 943, 965 (Bankr. D.S.C. 1995) (citation omitted). Equitable subordination is an extraordinary remedy to be applied sparingly. Nat'l Emergency Servs. v. Williams, 371 B.R. 166, 170 (W.D. Va. 2007) (citing Fabricators, Inc. v. Technical Fabricators, Inc., 926 F.2d 1458, 1464 (5th Cir. 1991)).

Because the court grants the JS&N defendants summary judgment as to Vieira's other claims, the court declines to equitably subordinate their claims.

**B.      SFH Defendants' Motion for Summary Judgment**

The SFH defendants argue that they are entitled to summary judgment on Vieira's FDCPA, civil conspiracy, disgorgement, and equitable subordination claims. The court will address each claim in turn.

**1.      Count VI – FDCPA**

The SFH defendants argue that they are entitled to summary judgment on Vieira's FDCPA claim.

As discussed above with regard to the JS&N defendants, there is no evidence that either Christy or SFH are in a "business the principal purpose of which is the collection of any debts" or that either "regularly collects or attempts to collect . . . debts owed or due or asserted to be owed or due to another." 16 U.S.C. § 1692a(6)). Moreover, because SFH was at most attempting to collect its own debts, it is not a debt collector under the FDCPA. Nielsen v. Dickerson, 307 F.3d 623, 634 (7th Cir. 2002) ("Because the FDCPA defines a 'debt collector' as a person who endeavors to collect the debts owed to 'another,' 15 U.S.C. § 1692a(6), creditors who are attempting to collect their own debts generally are not considered debt collectors under the statute."). Christy, as president of SFH, falls squarely within § 1962a(6)(A), which excludes from the definition of debt collector an "officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor."

Therefore, the court grants the SFH defendants summary judgment as to Vieira's FDCPA claim.

### 2.     Count VII – Civil Conspiracy/Joint Enterprise

The SFH defendants argue that they are entitled to summary judgment on Vieira's civil conspiracy/joint enterprise claim.  In response, Vieira simply repeats her response to the JS&N defendants' motion.  See Pl.'s Resp. to SFH Defs.' Mot. 10-18.  As discussed above, Vieira has not presented any evidence that the defendants were acting for a common purpose, much less that their purpose was to injure the Gosses.  Therefore, the court grants the SFH defendants summary judgment as to Vieira's civil conspiracy/joint enterprise claim.

### 3.     Disgorgement

Because disgorgement is an equitable remedy, and the court grants the SFH defendants summary judgment on Vieira's other claims, the court denies Vieira's request for disgorgement.

### 4.     Equitable Subordination

The SFH defendants argue that their claims should not be equitably subordinated. As with the JS&N defendants, because the court grants summary judgment on all causes of action against the SFH defendants, it declines to equitably subordinate their claims in the bankruptcy proceeding.

### C.     Silverman's Motion for Summary Judgment

### 1.     Civil Conspiracy

As discussed above with regard to both the JS&N defendants and the SFH defendants, there no evidence that the defendants' purpose in entering this transaction was to harm the Gosses.  Therefore, the court grants Silverman summary judgment on Vieira's civil conspiracy claim.

**2.      Disgorgement**

Because disgorgement is an equitable remedy, and the court grants Silverman summary judgment on Vieira's other claims, the court denies Vieira's request for disgorgement.

**3.      Equitable Subordination**

Silverman asserts that his claim should not be equitably subordinated.  Because there is no evidence that Silverman acted inequitably, the court declines to equitably subordinate his claims in the bankruptcy proceeding.

**III.  CONCLUSION**

Based on the foregoing, the court **GRANTS** the JS&N defendants' motion for summary judgment; **GRANTS** the SFH's defendants' motion for summary judgment; and **GRANTS** Silverman's motion for summary judgment.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 23, 2015**
**Charleston, South Carolina**